## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JUSTIN MAPLES,

       Plaintiff,

vs.                                        No. CIV 12-0294 JB/RHS

MATTHEW VOLLMER,
an Officer of the Albuquerque
Police Department, Individually, D.
FOX, an Officer of the Albuquerque
Police Department, Individually,
CITY OF ALBUQUERQUE,
a municipality organized under the
laws of the State of New Mexico,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendants' Motion to Dismiss, filed December 20, 2012 (Doc. 19).   The Court held a hearing on January 25, 2013.   The primary issue is whether the Court should enter an order of dismissal as a sanction for Plaintiff Justin Maples having allegedly committed perjury during discovery. The primary issue is whether Maples' imprecise and apparently contradictory statements in his answers to interrogatories and during his deposition warrant the Court to dismiss his case as a sanction.   The Court will deny the Motion to Dismiss.   The Court concludes that, based on the factors in <u>Ehrenhaus v. Reynolds</u>, 965 F.2d 916, 921 (10th Cir. 1992), that the United States Court of Appeals for the Tenth Circuit requires district courts to consider in deciding to grant dismissal as a discovery sanction, dismissal of Maples' case is not appropriate under the facts.   Although providing inaccurate answers prejudices the defendant, the prejudice here is not substantial, as the inaccuracies have not caused delay or added significant expense, and will likely not prejudice the Defendants at trial.   Additionally, because

Maples provided an affidavit along with his Response in Opposition to Defendants' Motion to Dismiss, filed January 14, 2013 (Doc. 25), conceding many inaccuracies and providing a credible explanation why they occurred, his conduct has not caused great interference with the judicial process.   Similarly, in providing an explanation and substituting his responses, Maples has demonstrated that his culpability, if any, does not rise to the level of that found in case law precedent in which dismissal was found appropriate.   That the Court has not previously warned Maples implicates due-process concerns, and the Court believes it unfair to dismiss in these circumstances.   Finally, although the Court declines to do so here, there are adequate sanctions aside from dismissal that the Court can justly impose on Maples for his conduct.

## FACTUAL BACKGROUND

On January 26, 2010, Defendants Matthew Vollmer and D. Fox were dispatched to 1111 Major Northwest, Albuquerque, New Mexico, Maples' residence, because of a 911 call.   See Complaint for Damages, Declaratory and Injunctive Relief and Petition for Writ of Mandamus ¶ 12, at 3, filed in state court on January 26, 2012, filed in federal court March 22, 2012 (Doc. 1-1)("Complaint").   Maples was standing in his front yard when the officers arrived and tried to walk away from them.   See id. ¶¶ 13-14, at 3.   Vollmer and Fox chased after Maples, and Maples then fled from the officers.   See id. ¶¶ 17-18, at 3.   Vollmer and/or Fox tackled Maples when they caught up to him.   See id. ¶ 19, at 3.   Maples alleges that Vollmer and Fox used "excessive and unnecessary force" against him, id. ¶ 20, at 4, and "caused him to suffer damages," id. ¶ 21, at 7. Vollmer placed Maples in handcuffs, arrested him, transported him to the prisoner transport center, and booked him.   See Affidavit of Matthew Vollmer ¶¶ 16-17, at 3, filed December 20, 2012 (Doc. 19-1).

## PROCEDURAL BACKGROUND

Maples instituted this lawsuit in state court on January 26, 2012, and the Defendants removed the case to this federal court on March, 22, 2012.  See Notice of Removal (Doc. 1). Maples alleges that Defendants Vollmer, Fox, and the City of Albuquerque violated his constitutional rights by using excessive force in arresting him on January 26, 2010, at 1111 Major, and falsely imprisoning him following his arrest.   The Defendants move the Court to dismiss the lawsuit as sanction, because Maples allegedly perjured himself throughout discovery.   Maples states that the "City of Albuquerque is sued under 42 U.S.C. § 1983 for damages under a theory of municipal liability for failure to adequately train [sic] supervise Defendant Matthew Vollmer and/or Defendant D. Fox and for its customs, policies, and/or practices."   Complaint ¶ 3, at 2. Maples also sues the City of Albuquerque "under the New Mexico Tort Claims Act . . . for damages under a theory of *respondeat superior*."   Complaint ¶ 4, at 2.   Maples states that "[t]his is a civil action for monetary damages, arising from Plaintiff's claims that he was illegally arrested, illegally imprisoned, suffered excessive force, and was otherwise wronged by Defendants Matthew Vollmer and D. Fox . . . ."   Complaint ¶ 10, at 3.   Maples alleges nine counts against the City of Albuquerque pursuant to the New Mexico Tort Claims Act, N.M.S.A. 1978, §§ 41-4-1 to -30 ("NMTCA"), and 42 U.S.C. § 1983: (i) Count I -- False Arrest under the NMTCA, see Complaint ¶¶ 22-27, at 4; (ii) Count II -- False Imprisonment under the NMTCA, see Complaint ¶¶ 28-33, at 5; (iii) Count III -- Assault under the NMTCA, see Complaint ¶¶ 34-37, at 5-6 ; (iv) Count IV -- Battery under the NMTCA, see Complaint ¶¶ 38-41, at 6; (v) Count V -- False Arrest/False Imprisonment under 42 U.S.C. § 1983, see Complaint ¶¶ 42-48, at 6-7;   (vi) Count VI -- Excessive Force under § 1983, see Complaint ¶¶ 49-57, at 7-8; (vii) Count VII -- Municipal

Liability (Custom and Policy) under § 1983, <u>see</u> Complaint ¶¶ 58-63, at 8-9; (viii) Count VIII --

Municipal Liability (Failure to Train and Supervise), <u>see</u> Complaint ¶¶ 64-69, at 9-10; (ix) Count

IX -- Respondeat Superior under the NMTCA, <u>see</u> Complaint ¶¶ 70-72, at 10-11.   On March 22,

2012, the Defendants removed this action to this federal court.   See Notice of Removal (Doc. 1).

### 1.      **The Alleged Discovery Abuses.**

On July 19, 2012, the Defendants sent Maples their First Set of Interrogatories and First

Requests for Production.   See Motion to Dismiss ¶ 3, at 4; Maples' Responses to Defendant City

of Albuquerque's First Requests for Production to Plaintiff Justin Maples at 1, filed December 20,

2012 (Doc. 19-3)("Response to First RFPs").   Maples responded on September 24, 2012,

providing signed medical releases only.   See Motion to Dismiss ¶¶4-5, at 4; Response to First

RFPs at 1-6.   Interrogatory No. 7, requested the following: "the name, address and phone number

of any health care provider, including, without limitation, any physicians, dentists, chiropractors,

mental health counselors, clinics and hospitals which treated you within the last 10 years"; Maples

responded: "UNMH primary care Hospital, seen physicians for health/wellness, mental health

clinic; [peer-to-peer [sic] counseling after DWI, In Los Lunas -- Valencia Counseling."

Plaintiff's Answers to Defendant City of Albuquerque's First Set of Interrogatories to Plaintiff

Justin Maples at 5-6, filed December 20, 2012 (Doc. 19-4)("Response to First Interrogatories").

<u>See</u> Motion to Dismiss ¶ 6, at 4.   Interrogatory No. 8, which requested the following: "Please list

the name, address and phone number of any mental health counselors, clinics and hospitals which

treated you within the last 10 years for any psychological and/or mental health treatment"; Maples

responded: "Please see my answer to Interrogatory No. 7, I have only been seen at UNMH and the

clinic I believe was called Valencia Counseling."   Response to First Interrogatories at 6.   <u>See</u>

-4-

Motion to Dismiss ¶ 7, at 4-5.

Interrogatory No. 9 requests the following: "Please state the name, address and phone number of each person who was with Plaintiff Justin Maples or has any knowledge of his activities on January 26, 2010"; Maples responded: "Kevin Lane and his daughter Sarah Lane." Response to First Interrogatories at 6.   See Motion to Dismiss ¶ 8, at 5.   Interrogatory No. 10 requests:

> State whether during the ten years immediately prior to the date of the occurrence alleged in the Complaint you had been confined to a hospital or other medical care facility or x-rayed for any reason. If so, for each such instance, state: a. The name, address and phone number of the hospital or medical care facility, medical doctor, osteopath, chiropractor, other health care provider; b. The approximate date of each such care, confinement, treatment or service; c. The reason for each such care, confinement, treatment or service; and d. Whether you (the Plaintiff) suffered any permanent effects or disability as a result thereof.

Maples responded: "Yes, I was. UNMH; suicide attempts/risk. I am willing to provide you with a reasonable medical release for my records."   Response to First Interrogatories at 6-7.   See Motion to Dismiss ¶ 9, at 5.   Interrogatory No. 13 states: "Please state your whereabouts on January 26, 2010 prior to the incident alleged in your Complaint"; Maples responded: "Home at 1111 Major Ave; all of the events happened at approximately 10:30 am; I was at residence since prior evening."   Response to First Interrogatories at 8.   See Motion to Dismiss ¶ 10, at 5. Interrogatory No. 18 asks: "Do you claim to have been physically injured as a result of the occurrence alleged in your complaint?"   Response to Interrogatories at 10.   Maples responded by stating that he was kicked in his abdominal area and back after he was tackled to the ground.   See id. at 10; Motion to Dismiss ¶ 11, at 5.   Interrogatory No. 27 states: "Please describe, in detail, how the incident on January 26, 2010 occurred, as it pertains to the allegations in your Complaint." Maples responded:

> [O]n or about January 26, 2010, Defendants Matthew Vollmer and D. Fox were

> dispatched to Plaintiff's residence and/or otherwise decided to respond to a 911 call at Plaintiff's residence. According to Defendant Matthew Vollmer and/or Defendant Fox, Plaintiff was standing in his front yard when they arrived at the residence.
>
> Upon information and belief, Plaintiff tried to walk away from Defendant Matthew Vollmer and/or Defendant D. Fox.   It was lawful for Plaintiff to decline to talk to Defendant Matthew Vollmer and/or Defendant D. Fox. It was lawful for Plaintiff to walk away from the Defendant Matthew Vollmer and/or Defendant D. Fox. Defendant Matthew Vollmer and/or Defendant D. Fox chased after Plaintiff.
>
> Plaintiff fled from Defendant Matthew Vollmer and/or Defendant D. Fox. Defendant Matthew Vollmer and/or Defendant D. Fox tackled Plaintiff. Defendant Matthew Vollmer and/or Defendant D. Fox used excessive and unnecessary force against Plaintiff. The use of force against Plaintiff by Defendant Matthew Vollmer and/or Defendant D. Fox caused him to suffer damages.

Motion to Dismiss ¶ 12 at 6.   See Response to Interrogatories at 15.

In his deposition, Maples testified that he had not taken any medications or anything else that would affect his ability to understand the questions asked of him or affect his ability to recall events.   See Deposition of Justin Maples at 5:5-8 (taken Nov. 20, 2012), filed December 20, 2012 (Doc. 19-5)("Maples Depo."); Motion to Dismiss ¶ 13, at 6.   Maples also testified that he had not taken anything that would affect his ability to answer questions truthfully.   See Maples Depo. at 5:9-11; Motion to Dismiss ¶ 13, at 6.   During his deposition, Maples was asked four times if he was having trouble with his memory, and he answered: "No."   Maples Depo. at 13:12-13, 28:20-29:6, 35:24-36:4, 36:14-17.   See Motion to Dismiss ¶ 14, at 6.   Maples testified that, on the night before the incident at issue in this lawsuit, January 25, 2010, he was at home, doing chores and hanging out with Kevin Lane, his partner.   See Maples Depo. at 39:19-40:8.   Maples also testified that, on the night before this incident, he smoked marijuana between 8:00 p.m. and 10:00 p.m., and he went to bed between 10:00 p.m. and 12:00 p.m.   See Maples Depo. at 41:6-18; Motion to Dismiss ¶ 15, at 6-7.   He testified that the incident underlying this lawsuit occurred at 9

a.m.  <u>See</u> Maples Depo. at 40:18-20; Motion to Dismiss ¶ 16, at 7.   He testified that he had an argument with K. Lane's daughter, S. Lane, after she arrived at the house about 8:00 - 8:30 a.m. <u>See</u> Maples Depo. at 42:1-12; Motion to Dismiss ¶ 16, at 7.   After the argument, K. Lane and S. Lane went out to the front yard, and he went to the kitchen and poured himself a cup of coffee. <u>See</u> Maples Depo. at 45:12-13.   After he poured the coffee, he saw K. Lane and S. Lane speaking to a police officer outside.  <u>See</u> Maples Depo. at 45:13-19; Motion to Dismiss ¶ 16, at 7.   He testified that he went out to the front porch, and the officer asked him to "come here," so he went to the gate.   The officer asked him what was going on and asked him to step outside of the gate.   He opened the gate, at which point the officer approached him with his hand on his hip, so he shut the gate and started running.   <u>See</u> Maples Depo. at 45:25-46:7; Motion to Dismiss ¶ 16, at 7.   Maples then admitted to fleeing from Vollmer, but stated that he could not remember whether the officer said anything to him as he fled.   <u>See</u> Maples Depo. at 51:14-52:4, 52:12-54:2; Motion to Dismiss ¶ 17, at 7.

During his deposition, Maples was asked to describe what happened after he was handcuffed.   <u>See</u> Maples Depo. at 59:5; Motion to Dismiss ¶ 18, at 7.   Maples described officers Vollmer and Fox having a conversation with one another and calling rescue to check on him after being sprayed with mace.   <u>See</u> Maples Depo. at 59:6-10; Motion to Dismiss ¶ 18, at 7.   During his deposition, Maples was asked about the police report where it stated: "Justin Maples was contacted after leaving the hospital at 1111 Major Northwest in reference to him causing a disturbance."   Maples testified that he could not recall whether he had been at the hospital the evening before this incident.   <u>See</u> Maples Depo. at 93:11-94:11; Motion to Dismiss ¶ 19, at 8.

Maples also testified that the incident occurred around 9:00 a.m., despite being asked about

the police report indicating that the incident occurred at 1443 military time, or 2:43 p.m. <u>See</u> Maples Depo. at 94:12-95:10; Motion to Dismiss ¶ 20, at 8.

When Maples was presented at his deposition with a police report from January 25, 2010, the night before the incident, Maples testified that he could not recall the police contacting him that evening. <u>See</u> Maples Depo. at 97:6-98:13; 98:23-99:8; Motion to Dismiss ¶ 21, at 8.   The police report from January 25, 2010, contradicts Maples' testimony that he was home and in bed before midnight on the evening of January 25, 2010.   <u>See</u> Maples Depo. at 41:6-18; Motion to Dismiss ¶ 21, at 8.

Toward the end of his deposition, Maples altered his earlier testimony that the incident had occurred at 9:00 a.m., when he testified that the incident occurred between 9:00 a.m. and 10:30 a.m.   <u>See</u> Maples Depo. 100:25-101:14; Motion to Dismiss ¶ 22, at 8.

At the end of his deposition, Maples' attorney, Anna C. Martinez, asked: "Other than the weight of the officers holding you down as you were taken down, did you feel as if you had been struck by any of the officers?"   Maples responded "Yes," and that he felt he had been kicked and punched.   Maples Depo. at 108:18-25.   The Defendants' attorney, Kristin J. Dalton, then asked: "Is there a reason you didn't mention that earlier in your testimony," Maples responded that she did not ask the question and explained: "I was expecting you to ask questions and for me to elaborate," and that he was not provided the opportunity to elaborate.   Maples Depo. at 109:25-110:11.

Contrary to Maples' testimony that he was at home the night before the incident, in addition to the police report from January 25, 2010, reflecting Maples' suicide threats, <u>see</u> State of New Mexico Uniform Incident Report dated January 25, 2010, filed December 20, 2012 (Doc.

19-8), there is an ambulance report from January 25, 2010, confirming that Maples had made a threat of suicide, that Maples' brother was present at the home during that time, and that Maples was transported to the hospital, <u>see</u> Albuquerque Ambulance Service Patient Care Report dated January 25, 2010, filed December 20, 2012 (Doc. 19-9).  <u>See</u> Motion to Dismiss ¶ 23, at 8-9. Medical records from the University of New Mexico Hospital ("UNMH") collected by the Defendants reflect that Maples was kept overnight at UNMH and released the morning of January 26, 2010.  <u>See</u> Emergency Department Physician Report dated January 26, 2010 at 1, 3, filed December 20, 2012 (Doc. 19-11); Motion to Dismiss ¶ 24, at 9.   Contrary to Maples' representation in his answers to Interrogatories about previous hospitalization indicating he had been treated only at UNMH, the Defendants' counsel obtained records from Presbyterian Hospital, in Albuquerque, indicating that Maples had been seen there for injuries he sustained in 2004, 2005, and 2009.  <u>See</u> Presbyterian Acute Care Record, dated July 31, 2004, filed December 20, 2012 (Doc. 19-12); Presbyterian Acute Care Record, dated December 16, 2004, filed December 20, 2012 (Doc. 19-13); Presbyterian Acute Care Record, dated July 5, 2005, filed December 20, 2012 (Doc. 19-14); Presbyterian Acute Care Record, dated October 13, 2009, filed December 20, 2012 (Doc. 19-15); Motion to Dismiss ¶ 25, at 9.

A UNMH record showing that he tested positive for alcohol, methamphetamine and cocaine contradicts Maples' deposition testimony that he had not used methamphetamine after 2009.  <u>Compare</u> Maples Depo. at 27:24-28:3, 31:6-14 (disclaiming methamphetamine use after treatment in 2009), <u>with</u> Behavioral Health Notes, dated March 4, 2010, filed December 20, 2012 (Doc. 19-16)(noting that Maples' urine tested positive for methamphetamine, alcohol, and cocaine).  <u>See</u> Motion to Dismiss ¶ 26, at 9.

2.      **The Motion to Dismiss.**

On December 20, 2012, the Defendants filed the Motion to Dismiss, requesting that the

"Court enter an Order of dismissal as a sanction for Plaintiff having committed perjury during

discovery." Motion to Dismiss at 1.   The Defendants assert that Maples "clearly perjured himself

during discovery and his deposition."   Motion to Dismiss at 9.   The Defendants argue that

dismissal of the case as a sanction is appropriate and that Archibeque v. Atchison, Topeka, and

Santa Fe Ry. Co., 70 F.3d 1172 (10th Cir. 1995), supports such a result.   See Motion to Dismiss at

9.   The Defendants contend that Maples perjured himself multiple times throughout pretrial

practice in the case:

> First, Plaintiff provided only the following as his health care providers for the last
> 10 years: "UNMH primary care Hospital, seen physicians for health/wellness,
> mental health clinic; [peer-to-peer counseling after DWI, In Los Lunas- - Valencia
> Counseling. [sic]" Supra, ¶ 6. This is false information; defense counsel obtained
> records from Presbyterian in 2004, 2005 and as recently as 2009. Supra, ¶ 25.
> Second, Plaintiff indicated that the only hospital he had been seen at for the 10
> years prior to the occurrence was UNMH. Supra, ¶ 9. Given the mere existence of
> the records from Presbyterian Hospital, this is a false answer. Third, Plaintiff
> provided false information as to his whereabouts on the morning of January 26,
> 2010 and the evening of January 25, 2010. Supra, ¶ 10. Records from Albuquerque
> Ambulance, Albuquerque Fire Department and UNMH contradict Plaintiff's
> testimony that he was "home" or at the residence of 1111 Major since the prior
> evening. The UNMH records indicate that he was not discharged from the hospital
> until nearly 10 a.m. on the morning of January 26, 2010. Even worse, Plaintiff
> attempted to subvert Defendants' attempt to prove his blatant perjury by stating that
> he "didn't remember" being transported to the hospital the night of January 25,
> 2010. Supra ¶ 21.
>
>      Fourth, Plaintiff stated in his answers to discovery, supra ¶ 11, that he was
> kicked in his abdominal area after he was "tackled"; an answer he did not provide
> during his deposition. Supra, ¶ 23. Fifth, in his answers to discovery, supra ¶ 12,
> Plaintiff stated that he was in the front yard at the time Defendant Vollmer and/or
> Fox arrived at the residence in response to being dispatched there or in response to
> a 911 call, in stark contrast to his deposition testimony. Supra ¶ 16.

Motion to Dismiss at 10-11.   The Defendants assert that such "blatant disregard for the judicial

system and the somberness of the sworn testimony alone justifies dismissal of his case with prejudice."   Motion to Dismiss at 11.

The Defendants assert that the Tenth Circuit set forth the following non-exhaustive factors a district court may consider in determining whether dismissal is an appropriate sanction:

> (1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions.

Motion to Dismiss at 11 (quoting Archibeque v. Atchison, Topeka, and Santa Fe Ry. Co., 70 F.3d at 1174)(citing Ehrenhaus v. Reynolds, 965 F.2d 916, 921 (10th Cir. 1992)).   The Defendants contend that a court's power to dismiss a case for perjury of a party in pretrial procedures, such as in discovery, is "[a]mong the multifarious manifestation of the court's inherent powers," and is an appropriate sanction for such conduct.   Motion to Dismiss at 11 (quoting Chavez v. City of Albuquerque, 402 F.3d 1039, 1043-44 (10th Cir. 2009))(citing Garcia v. Berkshire Life Ins. Co. of Am., 569 F.3d 1174, 1180 (10th Cir. 2009)).

The Defendants argue that Maples' untruthfulness throughout discovery prejudiced them, as it "has hampered their ability to file a motion for summary judgment on qualified immunity grounds."   Motion to Dismiss at 12.   The Defendants assert that Maples misrepresented where he was the night before the incident to preclude their theory that Vollmer knew he had just been released from the hospital for attempted suicide, was trying to break into a home, and thus presented a danger to officer safety.   See Motion to Dismiss at 12.   The Defendants contend that Maples' conflicting accounts whether he was hospitalized the night before and whether he lived at 1111 Major -- the house at which he was arrested for allegedly trying to illegally enter -- preclude them from establishing undisputed facts necessary to a summary judgment motion based on

-11-

qualified immunity.   See Motion to Dismiss at 13.   The Defendants also argue that Maples'
misrepresentations prejudice their ability to prepare for and present evidence at trial, as the
conflicting accounts will not allow for direct and fluid impeachment of Maples.   See Motion to
Dismiss at 13.   The Defendants state:

> Plaintiff's failure to identify his medical providers in a truthful manner, failure to be
> honest about his illicit drug use and failure to provide truthful answers with regard
> to the amount of force used during his arrest all impair Defendants' ability to
> prepare this case for trial and introduce testimony about these subjects.

Motion to Dismiss at 14.

The Defendants argue that Maples' misrepresentations are not negligible, but interfere with
the judicial process.   See Motion to Dismiss at 14.   The Defendants contend that Maples'
misrepresentations of important facts under the guise of not remembering these facts subverts the
pretrial process and "is a blatant disregard for the judicial process."   Motion to Dismiss at 14.
The Defendants assert that Maples' continuous misrepresentation of crucial facts in his responses
to interrogatories and in depositions, and his "unbelievable" stories about events that he later
recanted when presented with Defendants' evidence show that Maples is culpable for the
misrepresentations.   Motion to Dismiss at 15.   The Defendants argue that the extent of Maples'
untruths counsel against giving Maples a warning before dismissing the case.   See Motion to
Dismiss at 15-16 (citing Chavez v. City of Albuquerque, 402 F.3d at 1045).   The Defendants
assert: "Plaintiff has already weaved his tangled web of lies throughout discovery and such a web
cannot be untangled by removing a single strand."   Motion to Dismiss at 15.   As to whether a
lesser sanction may be appropriate, the Defendants argue that "[l]ying under oath does not merit a
lesser sanction as it demonstrates a blatant disregard and disrespect for the judicial process and
renders the oath given to deponents entirely meaningless . . . . [and] makes a mockery of the

-12-

judicial process."   Motion to Dismiss at 16.   The Defendants contend, therefore, that their request that the Court dismiss the case is proper at this stage.   See Motion to Dismiss at 16-17.

On January 14, 2013, Maples filed his Response in Opposition to Defendants' Motion to Dismiss (Doc. 25)("Response"), asserting that the "confusion" in his conflicting testimony "arises from a lack of precision, not from dishonesty."   Response at 4.   Maples attached his Affidavit to his Response to explain some of his statements' inconsistencies or the confusion surrounding his statements.   Maples asserts that he has done his "best to be honest at all times in this case.   That includes answering Interrogatories and testifying at my deposition."   Affidavit of Plaintiff Justin Maples ¶¶ 6-7, at 1, filed January 14, 2013 (Doc. 25-1)("Affidavit").   Maples states that he lived at 1111 Major at all times material to the case with K. Lane, that S. Lane never resided there, and that he has ample evidence to prove that he resided at 1111 Major when the incident occurred. See Affidavit ¶¶ 5, 11, 12, 48, 49, 50, 51, at 2.

Maples explains his inconsistent testimony whether the incident happened in the morning by admitting that he has "been shown the police report that states that the events happened in the afternoon," but stands by his testimony, stating that "I remember the events happening in the morning."   Affidavit ¶¶ 15-17, at 2.   He nevertheless admits that "I could be wrong about the time, I remember that the events happened during my morning routine."   Affidavit ¶ 18, at 2.

Regarding his trip to UNMH the night before the incident and being kept there overnight, he affirms that he does not remember any contact by police that night: "I told the lawyer for the defendants that I could not recall being contacted by the police the night before the incident that is described in this lawsuit and I still do not remember any contact on the night before." Affidavit ¶ 19, at 2.   See Affidavit ¶¶ 13-14, at 2; id. ¶ 46, at 4.   Maples states that he "did not intentionally

-13-

hide" that he had been seen at Presbyterian hospital.   Affidavit ¶ 23, at 3.   He asserts that he was being truthful when answering his interrogatories and that he does not remember being seen at Presbyterian Hospital, likely because he has been treated at many hospitals in the recent past leading up to the incident.   See Affidavit ¶¶ 21-25, at 2-3.   Maples explains this test by stating in his Affidavit that he "told the doctors there that [his] then boyfriend and his friend had done meth, but that . . . . Mr. Lane and his friend had physically held [him] down and forced [him] to ingest a liquid substance against [his] will" that, he asserts, must have contained methamphetamine. Affidavit ¶¶ 33-34, at 3.

Maples states that he admitted in his answers to the Interrogatories that the police officers tackled him, and admitted in his deposition testimony that he fled from the officers when they arrived.   See Affidavit ¶¶ 37, 40, at 4.   As to why he did not tell the Defendants' attorney that he was kicked in the stomach, he asserts:

> At my deposition, the lawyer for the defendants did not ask me if I was kicked in the abdomen or about being beaten.   I expected her to ask questions about how I was injured, but she did not.   My lawyer asked me about it and I was truthful.   The lawyer for the defendants then asked me why I didn't say anything about being beaten.   I told her it was because she had not asked me about it.

Affidavit ¶¶ 51-55, at 5.

In his Response, Maples argues that the sanction of dismissal for "alleged discovery abuses should only be exercised where a plaintiff engages in 'extreme' misconduct," Response at 5 (quoting Ehrenhaus v. Reynolds, 965 F.2d at 920)(citing Meade v. Grubbs, 841 F.2d 1512, 1520 (10th Cir. 1988); Paiz v. United States Postal Serv., 214 F.R.D. 678, 680 (D.N.M. 2003)), and that "[d]ismissal is a sanction of last, not first, resort," Response at 5 (citing Davis v. Miller, 571 F.3d 1058, 1061 (10th Cir. 2009); Ehrenhaus v. Reynolds, 965 F.2d at 920).   Maples contends that the

conduct does not justify such an extreme sanction, because courts are to use dismissal only when a party's bad faith in complying with discovery justifies such an extreme sanction, or where the discovery abuse is "knowingly, willfully, and intentionally," rather than where the alleged abuse results from inability to comply.   Response at 6 (quotation marks omitted).   Maples asserts that the five non-exhaustive facts that the Tenth Circuit set forth in Ehrenhaus v. Reynolds "serve as a vehicle to evaluate the 'willfulness' of alleged discovery abuse."   Response at 7 (quoting Lee v. Max Int'l, Inc., 638 F.3d 1318, 1323 (10th Cir. 2011); Freddie v. Martin Transp., Ltd., 428 F. App'x 801, 803 (10th Cir. 2011) (unpublished); Ehrenhaus v. Reynolds, 965 F.2d at 920-21). Maples contends that Toms v. S.B., Inc., 280 F.R.D. 603, 610 (D.N.M. 2012)(Lynch, J.), informs the Court's decision in this case.

Maples asserts that the Honorable William P. Lynch, United States Magistrate Judge, came to the conclusion in Toms v. S.B., Inc. that: (i) even willfulness in discovery abuse rarely suffices for a court to impose the ultimate sanction of dismissal; and (ii) Tenth Circuit case law consistently requires refusal of a party to comply with a court's orders as a condition precedent to justifying dismissal as a sanction.   See Response at 7 (citing Toms v. S.B., Inc., 280 F.2d at 610-11). Maples contends that anything short of disobeying a court order does not justify dismissal of the case, asserting that, as Judge Lynch concluded, "the Court considers 'disobedience' to direct, specific court instructions from the court constitutes a more serious abuse than 'general misbehavior' related to general discovery rules."   Response at 8 (quoting Toms v. S.B., Inc., 280 F.2d at 611).

Maples argues that his conduct has not risen to the level of discovery abuse.   See Response at 8.   He states that he does not remember his past medical treatment about which he

allegedly lied during discovery.   He asserts that opposing "counsel's belief that Plaintiff's lack of recollection is 'fanciful' does not amount to evidence that his testimony is untruthful."   Response at 8.

Maples argues that, under the Ehrenhaus v. Reynolds factors, even if the Court finds that he committed discovery abuse, the abuse does not rise to the level that would justify the extreme dismissal sanction.   See Response at 9.   Maples asserts that his statements did not prejudice the Defendants, because they still have time to file a summary judgment based on qualified immunity, and, because the officers' actions are scrutinized under an objective standard, his statements are unnecessary for the motion.   See Response at 9.   Maples states that, even if his inconsistent statements would somehow defeat the summary judgment motion, he contends that "[a]ctual prejudice under Ehrenhaus occurs where the non-violating party is prejudiced in obtaining discovery or compelled to accrue additional significant costs in discovery because of abuse." Response at 9 (citing Toms v. S.B., Inc., 280 F.R.D. at 618 n.7; Gomez v. Dillon Cos., Inc., 2010 U.S. Dist. LEXIS 47974, at *7-8 (D. Colo. 2010)).   Maples asserts that the Defendants do not contend and have not shown that they have incurred additional discovery costs because of Maples' alleged untruthful statements.   See Response at 9.   Maples argues that there has not been any interference with judicial process as Ehrenhaus v. Reynolds uses that phrase, because

> [w]hen considering this element of Ehrenhaus, courts consider the following: (1) the amount of delay in resolution of the case; (2) the ability of the Court to manage its docket and avoid placing unnecessary burdens on the court and opposing parties; (3) whether the plaintiff's misconduct has delayed discovery and brought the case to a halt; (4) the court's ability to preside over a fair and orderly trial; (5) whether the Court had to amend its scheduling order and suspend the litigation; (6) whether the court was required to stay the case and issue an order to show cause; (7) whether there was a continuous filing of vexatious pleadings that caused delays; and (8) repeated refusals to comply with a court's instructions and orders.

-16-

Response at 10 (internal citations omitted).   Maples contends that the Court should not find that this factor weighs in favor of sanctioning him, as the common thread in all of these elements is a delay in judicial proceedings, which has not happened here.   See Response at 10.   Maples argues that he is not culpable, because, whereas the Defendants assert that he has provided them with untruths, he still adheres to many of his statements or lacks memory of such events.   He points out that these statements are thus not lies and should be left to the trier of fact to determine which versions are the facts.   See Response at 11.   He asserts that, regardless whether the statements are true, because he lacks memory or adheres to his statement even in the face of proof to the opposite, he cannot be willfully abusing discovery.   See Response at 11.

Maples points out that the Defendants concede that there has not been any advanced warning of dismissal.   See Response at 11-12.   He contends that, in light of Judge Lynch's reasoning in Toms v. S.B., Inc., this factor weighs heavily in favor of finding dismissal unjust, as not only has he not violated a court order, but he has not received notice at all of his discovery abuses before this motion to dismiss.   See Response at 12.   Maples argues that the Defendants' reliance on Chavez v. City of Albuquerque is misplaced: "Chavez, however, is inapposite to the facts of this case.   In Chavez, the plaintiff admitted at trial, while under cross-examination, that he had lied throughout the discovery process in denying he was the suspect the police were searching for when he was apprehended."   Response at 12 (citing Chavez v. City of Albuquerque, 402 F.3d at 1042).   He reiterates that he has not lied here; he asserts that he merely lacked memory of certain events and continues to lack memory of others.   See Motion at 12.   Moreover, he points out that we are not post-trial and that there has been no finding of perjury.   See Motion at 12-13. Maples contends that, to the extent the Court were to determine sanctions are appropriate,

dismissal is inappropriate, because the Court can otherwise fashion efficient sanctions.   See Response at 13.   He states: "Although Plaintiff contends that he does not need any additional time to comply with discovery orders or obligations because no notice of lack of compliance exists, there is no question that a sanction less than dismissal could be fashioned in order to remedy any abuse found."   Motion to Dismiss at 13.   Maples asserts that, because the Tenth Circuit has advised that dismissal is an extreme sanction that courts must use sparingly, if the Court decides to sanction him, dismissal is inappropriate at this stage.   See Response at 14 (citing Ehrenhaus v. Reynolds, 965 F.2d at 920).

On January 22, 2013, the Defendants filed their Defendants' Reply to Plaintiff's Response in Opposition to Motion to Dismiss.   See Doc. 26 ("Reply").   The Defendants argue that Maples asserts in his Response that the Court should not dismiss the case because he has not admitted to perjury or has not been found to have perjured himself, but they contend that "[t]his, however, is nothing more than an exaggerated position with regard to the availability of dismissal based on discovery abuses."   Reply at 1-2.   They assert that the willful omission of discovery information, and willfully providing false and misleading statements in discovery, is an abuse of the discovery process sanctionable by dismissal.   See Reply at 2 (citing Archibeque v. Atchison, Topeka, and Santa Fe Ry. Co., 70 F.3d at 1173).   The Defendants argue: "What is at issue in this case is how Plaintiff has used vague, evasive, misleading, inconsistent, and on some occasions, false answers to questions asked in Interrogatories and during his deposition to misguide, mislead and confuse defense counsel; in addition to perjuring himself in the process."   Reply at 2.   They assert that these alleged abuses justify dismissal as a sanction.   See Reply at 2.   They also contend that Maples' Response "is rife with inconsistencies, which evidences Plaintiff's disregard for the

judicial system," including that he now suggests he has serious memory problems and now admits to treatment in medical facilities other than those visits he identified in discovery.   Reply at 2-3. The Defendants assert that they asked Maples four times during his deposition if he had problems with his memory, to which he responded that he did not.   See Reply at 2.   Additionally, they add that his answers to Interrogatories regarding medical treatment and where he was treated are clear. See Reply at 2-3.

The Defendants argue that Maples' contention that his errors in properly responding to their discovery requests and questions in his deposition did not prejudice them is untrue:

> Plaintiff's evasive, false, misleading and vague answers have prevented Defendants from discovering information about Plaintiff's mental and/or emotional state on the date of the incident . . . . [,] have prevented Defendants from discovering information about Plaintiff's past that may have bearing on his mental, emotional and/or physical state on the day of the incident and his current mental, emotional and/or physical state . . . . [,] [and] have prevented Defendants from requesting summary judgment from the Court on the basis of qualified immunity.

Reply at 4-5.   They assert that Maples' contention that his failure to inform the Defendants that Presbyterian Hospital treated him is immaterial to any aspect of the case is false, as his claim for damages includes his mental and emotional damages, and all past medical care may be probative of such damages.   See Reply at 5.   The Defendants contend that, whereas Maples "attempts to mitigate the seriousness of his false answers in discovery by claiming that he just did not remember having been treated" at Presbyterian Hospital in the past, or UNMH the night before his arrest, they point out that "nowhere in [his] answers to Interrogatories, Responses to Requests for Production and especially in his deposition, did he ever claim or admit to having trouble remembering the full answer to any of the questions posed."   Reply at 6-7.

The Defendants argue that Maples' "claim that he was merely 'imprecise' in his answers

does nothing but support Defendants' arguments that Plaintiff has abused the discovery process."
Reply at 8.   They contend that Maples' "attempts to use 'imprecision' to excuse his perjury . . .
does nothing to explain how imprecision can be anything but discovery abuse."   Reply at 8 (citing
Fed. R. Civ. P. 37).   They assert that, by calling his misrepresentations imprecisions, Maples fails
to take responsibility for his actions and further abuses the judicial process, which provides more
support for sanctioning him by dismissing the case.   See Reply at 8-9.

The Defendants argue that the similarity between Maples' excuse of imprecision and the
plaintiff's excuses of oversight and imprecision in Archibeque v. Atchison, Topeka, and Santa Fe
Ry. Co., 70 F.3d at 1173, counsel in favor of dismissing the case, as the Tenth Circuit noted is
permitted in such a case.   See Reply at 9.   They assert that Maples' discovery abuses are
distinguishable from the plaintiff's abuses in Tom v. S.B., Inc., which Judge Lynch found did not
warrant dismissal, because the plaintiff's abuses there did not lead to the defendant's "inability to
utilize a legal defense available . . . under federal law."   Reply at 9-10.   They contend that thus
"Plaintiff's discovery violations in this case are not simply related to the discovery rules, as they
were in Tom; Plaintiff's actions have a much larger implication in the defense of this case."
Reply at 10.   The Defendants argue that Maples' assertion, derived from footnote 7 in Tom v.
S.B., Inc., that

> actual prejudice can only be shown if the non-violating party is prejudiced in
> obtaining discovery or compelled to accrue additional significant costs in discovery
> because of abuse . . . . is not the standard under Ehrenhaus v. Reynolds . . . and
> should not be applied to the circumstances in this case.   In the Tom case, the court
> was dealing with violations of Fed. R. Civ. P. 37(c) (failure to disclose) and not the
> more serious allegations contained in Defendants' Motion to Dismiss -- that of
> Plaintiff's perjury.

Reply at 10.   The Defendants assert that the Ehrenhaus v. Reynolds factors for determining

whether dismissal is warranted weigh in their favor, and the Court should dismiss the case.   They contend that, whereas Maples argues that there has been no delay and thus no prejudice to the Defendants, the Court's refusal to dismiss the case "might [] force[]" them to "seek a continuance of the trial date and a re-setting of the deadlines in this case in order to pursue a motion for summary judgment based on qualified immunity."   Reply at 10-11.   They assert that Maples' statements have "hampered" their ability to prepare for trial, because the "Defendants have [] been prejudiced in their ability to impeach Plaintiff based on Plaintiff's evasive and admittedly 'imprecise' answers in discovery."   Reply at 11.   In regard to the lack of prior warning, the Defendants contend that prior warning is unnecessary, "because of the seriousness of Plaintiff's discovery violations."   Reply at 11 (citing Archibeque v. Atchison, Topeka, and Santa Fe Ry. Co., 70 F.3d at 1175).   The Defendants thus ask the Court to dismiss the case "as a sanction for Plaintiff's perjury and continual, willful, and intentional discovery abuses during discovery."   Reply at 11.

At the hearing on the Motion to Dismiss, the Court noted that it thought the best strategy for oral argument was to take the alleged incidents of discovery abuse in succession, and the Defendants began by discussing the failure to list Presbyterian Hospital, which they obtained through their general practice of sending Maples' release to hospitals around Albuquerque.   See Transcript of Hearing at 3:17-20 (taken Jan. 25, 2013)(Court)("Tr.");[1] id. at 6:22-7:3 (Dalton). The Court asked the Defendants whether they are asking the Court to make a credibility determination as to Maples and his statements, which the Court noted both the Tenth Circuit and Supreme Court of the United States have directed district courts not to do at the motion to dismiss

---

[1]   The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.   Any final transcripts may contain slightly different page and/or line numbers.

and summary judgment stages.   <u>See</u> Tr. at 7:13-25 (Court).   The Defendants pointed the Court to the Supreme Court's guidance in <u>Scott v. Harris</u>, 550 U.S. 372 (2007), in which the Supreme Court decided that, where two parties tell contradictory stories, one of which the record indisputably contradicts, the courts need not accept the contradicted statement as true.   <u>See</u> Tr. at 8:1-8 (Dalton).   The Court asked whether the Defendants believed that the Tenth Circuit has severely limited the Supreme Court's holding in <u>Scott v. Harris</u>, requiring a situation almost exactly like <u>Scott v. Harris</u>, in which a videotape recording contradicts the plaintiff's statements.   <u>See</u> Tr. at 8:9-22 (Court).   The Defendants replied that the Presbyterian Hospital medical records showing that Presbyterian Hospital treated Maples multiple times, which he failed to disclose, is sufficiently analogous that the Court should accept the Defendants' version of the facts as uncontroverted.   <u>See</u> Tr. at 8:23-9:1 (Dalton).   The Court asked the Defendants whether that issue is the problem at this stage, given that Maples does not seem to be disputing as untrue the evidence that the Defendants submitted with their motion to dismiss, but that he is rather asserting that he did not and still does not remember many of those facts.   <u>See</u> Tr. at 9:2-16 (Court).   The Defendants responded that their argument is that the cumulative nature of Maples' inconsistencies, and failures to remember or disclose facts, counsels in favor of dismissal as a sanction.   <u>See</u> Tr. at 9:17-25 (Dalton, Court).   The Defendants asserted that, in regard to the factor dealing with Maples' culpability, his failure to supplement his discovery before the Motion to Dismiss evinces his culpability, and only after they filed the Motion to Dismiss did he provide explanation for his statements in his Affidavit.   <u>See</u> Tr. at 10:1-14.

Maples responded that he did not recall visiting Presbyterian Hospital in the past, and will testify at trial that the Defendants' records refreshed his memory.   <u>See</u> Tr. at 11:3-15 (Martinez,

Court).   The Court inquired why Maples was taken to Presbyterian Hospital and whether Presbyterian is or was his health care provider.   See Tr. at 12:1-3 (Court).   Maples responded that Presbyterian Hospital was, when he was a minor, his health care provider, but that was close to ten years before the incident, and that he cannot recall why he was taken to Presbyterian Hospital those times.   See Tr. at 12:4-13:1 (Martinez, Court).   Maples explained that his medical records disclose that he has visited a hospital -- which he believed was limited to UNMH -- at least fourteen times just since 2006.   See Tr. at 13:2-10 (Martinez, Court).

In regard to the alleged beating misrepresentations during Maples' deposition, the Court asked the Defendants whether they "ask[ed] him point blank whether he had ever been kicked or hit by the officers?"   Tr. at 15:17-18 (Court).   The Defendants responded:

> No, but that's kind of the crux of my argument, which is to say that providing misleading answers is almost as bad, in my opinion, as providing false answers or getting up there in rank.   When you don't provide truthful answers to a very open-ended question, . . . it impedes on the defense's ability to discovery all of the facts in the case.

Tr. at 15:19-25 (Dalton).   The Court asked why, knowing what they did about the case, from the Complaint and other discovery, they did not ask whether the police beat, kicked, or punched him. See Tr. at 16:9-13.   The Defendants responded that, while the Complaint alleges that the police struck Maples, they assumed that it was referring to being sprayed with mace during the arrest. See Tr. at 16:14-16 (Dalton).   They stated that they "thought the question 'what happened after you were handcuffed,'" is open-ended enough that he would have responded by telling the Defendants about the officers kicking and punching him.   Tr. at 16:21-25 (Dalton).

Maples asserted that his attorney instructed him to answer the questions asked of him and nothing more, and that, thus, because the Defendants did not ask him during his deposition

-23-

whether the officers struck him, he did not tell them.  See Tr. at 17:9-17 (Martinez).  Maples stated that he believes the question what happened after he was handcuffed was far too open-ended and ambiguous for him to know that he should have then told the Defendants about being kicked and punched by them.  See Tr. at 17:24-25 (Martinez).  The Court asked Maples' attorney, Ms. Martinez, whether, on Maples' redirect examination at the deposition, she was cognizant that Maples had not yet testified to the officers' striking him during the arrest, and whether that observation was why she brought up the question.  See Tr. at 18:10-15 (Court, Martinez).  Ms. Martinez stated that she was aware the question had not been asked and that was the reason why she asked Maples about the striking.  See Tr. at 18:16-22 (Martinez).

The Court then asked the Defendants whether Maples is sticking with his prior statements about being on the porch the morning of the incident, even though he has seen the Defendants' evidence which shows that he was at UNMH overnight the night before and into that morning. See Tr. at 19:16-24 (Court).  The Defendants responded that they believe he is sticking with that story, and that he is also still asserting that the incident occurred in the morning, rather than, as the police record reflects, in the afternoon.  See Tr. at 19:25-20:9 (Dalton).  The Defendants argued that the problem with Maples' position is that his recent lack of memory is inconsistent with his detailed prior deposition testimony, where his statements were unequivocal that he was at the house overnight and there in the morning, providing explicit details about what he did and what time he went to bed.  See Tr. at 20:10-16 (Dalton).  Maples responded that he was testifying to his recollection to the best of his knowledge and belief.  See Tr. at 21:10-12 (Martinez).  As an example of his veracity at the deposition, he brought to the Court's attention that, when he was asked how many times the Albuquerque Police Department had handcuffed him or arrested him,

-24-

he truthfully responded that they had done so at least fifteen times in the past.   See Tr. at 21:12-18 (Martinez).   He explained that he believed the incident took place in the morning, because K. Lane usually leaves their home around 9:00 a.m., and because he owns a carpeting business, and he was still at home that day.   Additionally, because he remembers just having made coffee and breakfast, and having let the dogs out, which is his daily routine each morning, he believed that the police's arrival while proceeding through that routine meant that the incident happened in the morning.   See Tr. at 21:23-22:8 (Martinez).   He stated that "because there have been so many police calls he just cannot distinguish this one from the others."   Tr. at 22:12-14 (Martinez).   He noted that he is not planning to vigorously dispute that evidence at trial; he is planning to dispute only whether he was illegally trying to gain access to the home, which he asserted he was not.   See Tr. at 22:14-18 (Court).   The Court asked whether, after viewing the medical records, he intends to stay with his story that he was not coming home from UNMH that morning.   See Tr. at 23:1-3 (Court).   He explained that he does not remember that event, and that he believes he should remember the event, as it was important to his arrest, but he does not.   See Tr. at 23:4-13 (Martinez).   The Defendants responded that his lack of memory is important to their argument for dismissal, because, beyond his inability to remember being at the hospital overnight stretching credulity, they asked him four times at his deposition whether he had trouble remembering the events and he stated that he did not. See Tr. at 23:21-24:5 (Dalton). They added that they told him during the deposition that, if he could not remember the events, he could testify as to his lack of memory, and he never took that opportunity.   See Tr. at 24:12-22 (Dalton).

The Court asked the Defendants what they find most troubling about Maples' Affidavit. See Tr. at 24:23-25 (Court).   The Defendants responded that the two most troubling assertions in

the Affidavit are: (i) that he was just at home having a normal day when S. Lane called police, because it rebuts their theory that he was breaking into the house, precluding summary judgment on qualified immunity; and (ii) that he now states he possibly misremembered the events of the day when he was testifying during his deposition, when, during his deposition, he was unwavering in his detailed memory of the events of the night before and the day of the incident. See Tr. at 25:5-22 (Dalton). Maples responded that he takes issue with the Defendants' contention that he now raises a "serious memory problem," by asserting that what he was trying to state was that "he has had serious problems, and on that date was answering to the best of his knowledge and ability." Tr. at 26:19-27:8 (Martinez).

The Court asked whether Maples addresses the alleged January 25, 2010, overnight trip to UNMH in his Affidavit or what his position regarding those events is now. See Tr. at 28:3-4 (Court). He points out that, in paragraph nineteen, he states only that he cannot remember any police contact that night, and he continues to stand behind his statement. See Tr. at 28:14-18 (Martinez).

The Court then asked whether the Defendants wanted to say anything about Maples' assertion that he was not out on the front porch when the police arrived. See Tr. at 29:12-14 (Court). The Defendants asserted "that does go also to the totality of the circumstances as to whether he was lawfully in the house or whether he was not supposed to be there as claimed [in] the 911 call." Tr. at 29:16-19 (Dalton). They stated that these statements prejudice their ability to ask for summary judgment, because, before the deposition and Maples' Affidavit, they understood the facts to be that Maples did not reside at the home and that he was outside trying to unlawfully enter when the police arrived. See Tr. at 29:20-30:1 (Dalton). The Court then asked

Maples whether he now admits in his Affidavit that he was outside when police arrived.   See Tr. at 30:3-10 (Court).   Maples confirmed that he admits he had just come outside the house when the police arrived, but still asserts that he lived in the home and was in the home when police first arrived.   See Tr. at 30:11-23 (Martinez).

The Defendants noted that Maples also was untruthful about his methamphetamine use, as his medical records which they submit with their motions reveals.   See Tr. at 31:12-20 (Dalton). The Court asked whether the Defendants are accepting his contention that he was force-fed the methamphetamine when K. Lane held him down.   See Tr. at 33:3-4 (Court). The Defendants asserted that, regardless whether the story is true or incredible, he answered their Interrogatories that he had not used methamphetamine since 2009, which the record contradicts, and he never provided explanation or supplemented his answers before they filed their motion. They asserted that this drug issues is just more evidence of the misrepresentations' cumulative nature.   See Tr. at 33:5-18 (Dalton).

The Court asked the Defendants what prejudice these inconsistencies caused them, because it appears that these statements have provided them a significant amount of impeachment material that they may use at trial.   See Tr. at 33:19-25 (Dalton).   The Defendants responded that the inconsistencies have prejudiced them in that the inconsistencies precluded them from winning a summary judgment motion on qualified immunity, and thus they must now try the case.   See Tr. at 34:4-24 (Dalton).   The Defendants asserted that, if the Court determines that Maples' statements do not rise to the level at which the Court were to conclude it should dismiss the case, that they would like an opportunity to move for summary judgment on the record as it stands for this motion.   See Tr. at 40:10-22 (Dalton).   The Court asked Maples whether, since the deadline for

-27-

summary judgment motions had passed, he would agree to extending the December 20, 2012, deadline for the Defendants to file a summary judgment on qualified immunity grounds.  See 43:23-44:3 (Court, Dalton).  He responded that he would like to depose the three officers to prepare for the motion.  See Tr. at 44:4-6 (Martinez).  The Defendants asserted that, because the discovery deadline passed in November, and because Maples did not take them up on their offer to extend the deadline if he filed a motion with the Court for an extension of the summary judgment motions deadline, which he did not do, they would not now agree to the officers' depositions.  See Tr. at 44:13-22 (Dalton).  The Court stated that, because the parties did not agree, it would not rule on extending the deadlines at the present time, but will do so if such a motion is filed after ruling on the Motion to Dismiss, if the parties file the motion.  See Tr. at 44:23-45:2 (Court).

## RELEVANT LAW REGARDING RULE 37 SANCTIONS

Rule 37(b) of the Federal Rules of Civil Procedure provides that, if a party fails to disclose or supplement information which the discovery rules require it to provide, the court "may impose other appropriate sanctions, including any of the orders listed in Rule 37(B)(2)(A)(i-vi)."  Fed. R. Civ. P. 37(c)(1)(C).  Those orders allow the court to impose various sanctions upon a party for failure to comply with "an order to provide or permit discovery," including: (i) ordering that designated facts be taken as established; (ii) precluding the disobedient party from supporting or opposing matters at issue, or "introducing designated matters in evidence;" (iii) "striking pleadings in whole or in part;" (iv) "staying further proceedings until the order is obeyed;" (v) dismissing the action; (vi) "rendering a default judgment against the disobedient party."  Fed. R. Civ. P. 37(b)(2)(A)(i)-(vi).  "Determination of the correct sanction for a discovery violation is a fact-specific inquiry that the district court is best qualified to make."  Ehrenhaus v. Reynolds, 965

F.2d 916, 920 (10th Cir. 1992).   The Tenth Circuit has noted: "Our case law makes it clear that a district judge may dismiss an action for discovery violations."   Archibeque v. Atchison, Topeka & Santa Fe Ry. Co., 70 F.3d 1172, 1174 (10th Cir. 1995).   Dismissal, however, is "an extreme sanction" that is appropriate only if there has been "willful misconduct."   Ehrenhaus v. Reynolds, 965 F.2d at 920 (citing Meade v. Grubbs, 841 F.2d 1512, 1520 (10th Cir.1988); M.E.N. Co. v. Control Fluidics, Inc., 834 F.2d 869, 872-73 (10th Cir.1987); In re Standard Metals Corp., 817 F.2d 625, 628-29 (10th Cir.), modified on other grounds sub nom Sheftelman v. Standard Metals Corp., 839 F.2d 1383 (10th Cir. 1987)(per curiam)).   The Supreme Court of the United States has held that "Rule 37 should not be construed to authorize dismissal of [a] complaint because of petitioner's noncompliance with a pretrial production order when it has been established that failure to comply has been due to inability, and not to willfulness, bad faith, or any fault of petitioner," and noted that a district court "possesses wide discretion to proceed in whatever manner it deems most effective" and just in the realm of discovery.   Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers, 357 U.S. 197, 212-13 (1958). Accord Archibeque v. Atchison, Topeka & Santa Fe Ry. Co., 70 F.3d at 1174 ("Because of the harshness of dismissal, however, due process requires that the discovery violation be predicated upon 'willfulness, bad faith, or some fault of petitioner' rather than inability to comply.")(quoting Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 640 (1976)(per curiam)).

The Tenth Circuit has held that a district court may not dismiss a complaint with prejudice as a sanction for failing to obey a discovery order without considering the non-exhaustive factors listed in Ehrenhaus v. Reynolds:

> Before imposing dismissal as a sanction, a district court should [] evaluate the
> following factors on the record: (1) the degree of actual prejudice to the [other

> party]; (2) the amount of interference with the judicial process; . . . (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions. This list, hereinafter referred to as the *Ehrenhaus* factors, is not exhaustive, nor are the factors necessarily of equal weight. Only when the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on their merits is dismissal an appropriate sanction.

Procter & Gamble Co. v. Haugen, 427 F.3d 727, 738 (10th Cir. 2005)(internal quotation marks and citations omitted).

In Archibeque v. Atchison, Topeka and Santa Fe Ry. Co., the Tenth Circuit affirmed the Honorable C. LeRoy Hansen, United States District Judge's order granting the motion to dismiss the plaintiff's complaint for failure to disclose her past medical history. See 70 F.3d at 1172. The plaintiff sought workers' compensation damages for personal injury to her back allegedly occurring at an unwitnessed work-related accident occurring in December 1990. See 70 F.3d at 1173. The defendant requested a complete set of medical records and asked through an interrogatory the number of accidents in which she had been involved. See 70 F.3d at 1173. The Tenth Circuit noted that her responses did not mention any lower back pain before 1990; she listed only two car accidents, in 1990 and 1992, and a bicycle accident in 1987; she stated that she had not had her lower back x-rayed before the alleged work-related incident in 1990; and she stated in her deposition that she had no recollection of lower back pain before the alleged 1990 incident. See 70 F.3d at 1173. When the defendant independently sought to verify her answers, it found documents proving that, for over ten years before 1990, "on over fifteen occasions, involving at least six physicians, Appellant sought treatment for a variety of lower back ailments and related symptoms." 70 F.3d at 1173. The documents revealed that she had x-rays taken multiple times at least as far back as 1984. See Archibeque v. Atchison, Topeka and Santa Fe Ry. Co., 70 F.3d at

1174.   When the defendant filed its motion to dismiss under rule 37, asking Judge Hansen to dismiss the case for these discovery abuses, she responded that the problems were with her tailbone, not her back, and "that her failure to disclose her past medical history was merely oversight." 70 F.3d at 1174.   The Tenth Circuit noted that "[s]he did not file amended interrogatory responses or an affidavit regarding her compliance with the discovery process.   She has [not], even in her arguments to this court on appeal, explained her conduct.   Instead, she concludes . . . she 'fully cooperated in the discovery process.'"   70 F.3d at 1174.   The Tenth Circuit upheld Judge Hansen's dismissal of the case, noting:

> The district court . . . noted the degree of prejudice suffered . . . and the impact Appellant's actions had with regard to AT & SF's ability to prepare for trial. The court noted the culpability of Appellant which we described above, specifically addressing the failure to disclose, the false statements, and the court's determination as to the credibility of Appellant's statements that her failures were mere oversight. The court found that Appellant's willful conduct seriously interfered with the judicial process, and expressly stated that it had considered lesser sanctions and determined that they were not appropriate.

70 F.3d at 1175.

In Garcia v. Berkshire Life Ins. Co. of Am., 569 F.3d 1174 (10th Cir. 2009), the Tenth Circuit upheld the district court's dismissal sanction where the district court concluded that the it "was 'an especially egregious case,' finding that 'the [plaintiff's] fabrications were prepared over a period of years and are calculating, carefully constructed, and self-serving.'"   569 F.3d at 1179. The issue litigated was whether the plaintiff, Garcia, was entitled to full benefits from her disability policy, because she was suffering from total disability "due to cognitive defects."   569 F.3d at 1177.   The defendant paid Garcia's claims under protest, because during the time she was allegedly fully impaired, she had received her Doctor of Jurisprudence "from the University of Denver College of Law, where she was named an 'Outstanding Law Graduate,' and subsequently

[] a Masters []. Moreover . . . Ms. Garcia had operated a real estate business during 2002, three years after the time she had first claimed total disability." 569 F.3d at 1177. The defendant brought a motion for dismissal as a sanction for discovery abuses, "asserting that Ms. Garcia falsified or fabricated at least four documents submitted during discovery." 569 F.3d at 1177. Two of the four allegedly fabricated documents were a "smoking gun" letter that the defendant's adjuster allegedly wrote and a letter to the Colorado Board of Bar Examiners in support of her request to be allowed double time for the bar examination, which her doctor allegedly wrote. Garcia v. Berkshire Life Ins. Co. of Am., 569 F.3d at 1177-78. Both the alleged author of the smoking-gun letter and the doctor alleged to have written the letter to the bar examiners testified at the sanctions hearing, and repudiated the assertion that they authored the documents. See 569 F.3d at 1178. The Tenth Circuit noted that the district court "found Ms. Garcia's testimony at the Sanctions hearing to be 'incredible,' []'refused to rely on any of it.' . . . [and] concluded that Ms. Garcia prepared fabricated evidence 'willfully, knowingly, intentionally, after careful contemplation, for self-serving purposes, and with a full understanding of the impropriety involved.'" 569 F.3d at 1177. The Tenth Circuit agreed with the district court's dismissal, reasoning:

> Ample evidence supported the conclusion that Ms. Garcia was herself culpable for the fabrications submitted in this case. Numerous inauthentic documents were submitted over a several year period, counseling against an explanation of mistake. Moreover, the fabrications were carefully constructed to look like authentic documents. Letters were made to look as though they were printed on authentic letterhead; emails were carefully spliced together so as to appear accurate; fax banners were added to documents to disguise their origin. . . . Finally, Ms. Garcia's evasive, inconsistent answers and inability to provide an explanation for the fabrications during the hearing cast further doubt on her accounting of events.

569 F.3d at 1181 (internal references omitted).

-32-

## ANALYSIS

The Court concludes that, based on the Ehrenhaus v. Reynolds factors that the Tenth Circuit requires district courts to consider in deciding to grant dismissal as a discovery sanction, dismissal of Maples' case is not appropriate.   Although providing inaccurate answers prejudices the Defendants, the prejudice is not substantial, as the inaccuracies have not caused delay or added substantial expense, and will likely not prejudice the Defendants at trial.   Additionally, because Maples provides an Affidavit along with his Response, conceding many inaccuracies and providing a believable explanation as to why they occurred, his conduct has not caused great interference with the judicial process.   Similarly, in providing explanation for his inconsistencies or imprecision, Maples has demonstrated that his culpability, if any, does not rise to the level of that in precedent finding dismissal appropriate.   That the Court has not previously warned Maples implicates due-process concerns if the Court were to dismiss the case on these circumstances, and the Court believes it unfair to do so.   Finally, the Court concludes that there are more appropriate sanctions for conduct in discovery analogous to Maples' actions and omissions. The Court, therefore, will deny the Motion to Dismiss.

## I.   MAPLES' CONDUCT HAS NOT CAUSED THE DEFENDANTS A SUBSTANTIAL DEGREE OF PREJUDICE.

The Defendants assert that the first factor which the Tenth Circuit set forth in Ehrenhaus v. Reynolds -- the degree of actual prejudice to the defendant -- weighs heavily in favor of dismissal, as Maples' misrepresentations have "hampered their ability to file a motion for summary judgment on qualified immunity grounds."   Motion to Dismiss at 12.   The Court disagrees.   Maples perhaps told an untruth or untruths regarding his whereabouts on the morning of his arrest and the

night before the arrest, stating that he was at home the night before the arrest and on the morning of

the incident, rather than that he was admitted to UNMH, and released the morning of the incident,

as UNMH records indicate.   See Emergency Department Physician Report at 1.   The Defendants

contend that Maples' refusal to admit his hospital visit the night before the incident for suicide

threats precludes them from showing that that the force Vollmer used was reasonable, because he

believed Maples was illegally trying to enter 1111 Major after being released from UNMH, and he

believed Maples being a suicide risk put Vollmer's safety at issue.   See Graham v. Connor, 490

U.S. 386, 396 (1989)("Determining whether the force used . . . is 'reasonable' under the Fourth

Amendment requires . . . careful attention to the facts and circumstances of each particular case,

including . . . whether the suspect poses an immediate threat to the safety of the officers or

others.").

     It is not clear that, even if Maples had admitted he visited UNMH the night before the

arrest, and admitted he was there because he was a suicide risk, his statements would have placed

the Defendants in any better position regarding qualified immunity.   Whether the amount of force

that a police officer uses in executing an arrest is unreasonable for Fourth Amendment purposes is

a fact determination that the jury generally makes.   Cf. Mata v. City of Farmington, 791 F. Supp.

2d 1118, 1141 (D.N.M. 2011)(Browning, J)(finding that the defendant officer is "not entitled to

qualified immunity on Mata's excessive force claims . . . .   A reasonable jury could find that [the]

conduct violated . . . [the plaintiff's] Fourth-Amendment rights")(citing Holland ex rel. Overdorff

v. Harrington, 268 F.3d 1179, 1192-93 (10th Cir. 2001)).   Moreover, while an officer's and a

plaintiff's subjective intent are probative of reasonableness, reasonableness is an objective test,

and is determined based on what a reasonable officer on the scene would have done in the

situation, not the particular defendant officer. See Graham v. Connor, 490 U.S. at 396 ("The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). What matters for purposes of the Defendants' summary judgment motion on qualified immunity is what a reasonable officer on the scene would have done, with the information Vollmer and/or Fox had at the time, including whether a reasonable officer would have believed the information to be credible. Thus, regardless whether Maples lived at 1111 Major, or whether UNMH had recently discharged him after a visit for attempted suicide, the question is whether a reasonable officer with this information would have believed the information, not whether the information is true. The Defendants' contention that any misrepresentations that Maples made "serious[ly] . . . hamper[]" Defendants' ability to file a motion for summary judgment on qualified immunity grounds" is without a sound basis in the facts of the case or in the relevant, applicable law. Reply at 10.

Given Maples responses in his Affidavit, it is also not clear that Maples was untruthful. Maples stands by his assertion that, at all times material to the case, 1111 Major was his residence. See Affidavit ¶¶ 5, 49, 50, at 1, 5. He also stands by his assertion that he was not suicidal when the police were called to 1111 Major, see Affidavit ¶ 8, at 2, and states: "I understand that the lawyer for the defendants has called my inability to remember the hospital trip before this incident 'fanciful,' but it is simply a fact. I do not remember being taken to the hospital the night before this incident." Affidavit ¶ 46, at 4. Finally, he admits to fleeing from officers at the scene. See Affidavit ¶¶ 43, at 4 ("I did attempt to run away from the police officers."); id. ¶ 45, at 4 ("[M]y testimony was that I did flee from the officer. That testimony is true."). Based on these statements in his Affidavit, beyond making it unclear what, if any, untruths there are which

precluded the Defendants from preparing for summary judgment, many of Maples' statements they allege were prejudicial "untruths" have not changed.

## II.   MAPLES' CONDUCT DID NOT SUBSTANTIALLY INTERFERE WITH THE JUDICIAL PROCESS.

The Defendants contend that Maples has significantly interfered with the judicial process, because he "has placed himself at a tactical advantage of claiming that he was lawfully at the residence and was not disturbing the peace or scaring the occupants of the home," and because the discovery of his Presbyterian Hospital medical records "have not [] afforded the[m] opportunities otherwise available to them to discover Plaintiff's history of illnesses, injuries, arrests, etc . . . ." Motion to Dismiss at 14.   This effect, they contend, "is a blatant disregard for the judicial process."   The Court disagrees with the Defendants on three grounds.

First, and importantly, based on the evidence before the Court, it is unclear that Maples' responses were untruths, as opposed to an inability to remember specific instances of his past conduct, and it does not appear that he intended any of his statements to put him at a tactical advantage.   Maples admits and explains that, for many of the statements that the Defendants contend are untrue, he lacked memory at the time, or else still holds to the statements as truths.   In regard to whether Maples somehow abused the judicial process by withholding information about hospital visits and thereby inhibiting the Defendants' discovery of his medical history, Maples noted at the hearing that, while it might be fanciful for many people to recall all of their hospital visits, it is not for him.   Maples has visited the hospital "at least 14 different" times since 2006. Tr. at 13:4-5 (Martinez).   It is thus not beyond credulity to believe that Maples could not remember, and thus left out, that Presbyterian Hospital was the hospital visited for one of those fourteen hospital visits.   That he also visited Presbyterian Hospital once in 2004 and once in 2005

does not change the Court's analysis, because, considering that he had visited a hospital fourteen times since 2006, three hospital visits appears to be a small percentage of his hospital visits, and these visits are in the distant past compared to the substantial amount of recent visits. Importantly, the Defendants have not submitted to the Court with the substantial evidence attached to its Motion to Dismiss any evidence showing that these Presbyterian Hospital visits are probative of Maples' damages.   Without such evidence, and in light of Maples' lengthy medical history, the Court cannot soundly conclude that Maples' inability to recall a relatively small portion of his hospital visits having occurred six to eight years ago is a blatant disregard of the judicial process. After all, the Defendants, with their routine practice of submitting plaintiffs' medical releases on all area hospitals, discovered this information relatively close to the same time they would have if Maples had been more accurate.

Second, when considering whether there has been interference with the judicial process, courts have often looked to whether the willful abuse of the discovery process caused delays in the judicial proceedings.   In Glaser v. Jordan, No. 09-CV-01758-REB-MJW, 2010 WL 2742794 (D. Colo. July 9, 2010), for instance, the court found that there was substantial interference with judicial process, as "[p]rogress toward the resolution of Glaser's case has been brought to a standstill by Glaser's inexplicable and unexcused failure to provide discovery."   2010 WL 2742794, at *3.   Similarly in Hall v. Wal-Mart, No. 09-CV-01410-WYD-CBS, 2009 WL 6337957 (D. Colo. Dec. 18, 2009), the court determined that there had been substantial interference with the judicial process, reasoning that the plaintiff's "continuing noncompliance with the court's orders has increased the workload of the court and interfered with the administration of justice," noting that "[m]ore than once the court has reviewed the file and set

hearings in the case" for which the plaintiff failed to appear.  2009 WL 6337957, at *3.  In Mobley v. McCormick, 160 F.R.D. 599 (D. Colo. 1995), aff'd, 69 F.3d 548 (10th Cir. 1995), the district court determined there had been a substantial interference with the judicial process, stating: "[I]t is sufficient to say that [the plaintiff] 'repeatedly ignored court orders and thereby hindered the court's management of its docket and its effort to avoid unnecessary burdens on the court and the opposing party.'" 160 F.R.D. at 601. Here, beyond scant evidence of any willfulness in any of Maples' his allegedly untrue statements, aside from this Motion to Dismiss, these statements have not caused any delay in the judicial proceedings for the Court or the parties.  While the Defendants reiterate their argument that, but for the statements, they would have filed summary judgment on qualified immunity grounds,   because the reasonableness of an officers' use of force is determined under an objective standard, and because the Defendants had substantial evidence about events the day of the incident, they could have submitted a summary judgment motion on qualified immunity grounds before submitting this motion to dismiss, or, rather than ask for sanctions, moved to dismiss on qualified immunity grounds here.  Although the Defendants suggested that they might be forced to seek a continuance of the trial deadline if the Court does not grant this Motion to Dismiss, they have not done so, and, if the request were based on Maples' allegedly untruthful statements, it would likely be a tough road to hoe.   Distinct from the case law precedent analyzing this factor, Maples has not ignored or failed to comply with court orders, or failed to show up for hearings.   And, from the Court's point of view, Maples has not failed to provide the Defendants with discovery to the extent that the failure has caused the case to come to a standstill.   The reality is that the Defendants have probably not moved for summary judgment, not because Maples abused the discovery process, but because the case appears, on this limited

record before the Court, riddled with genuine issues of fact.

Third, although Maples explains his inconsistent or imprecise statements and continues to adhere to others -- such as his belief that the incident occurred in the morning or that he is unable to recall staying overnight at UNMH the night before the incident -- regardless of substantial evidence to the contrary, such inconsistencies likely do not interfere with the judicial process much, if at all, as they may be explored on cross examination.   While Maples' statements might not rise to the level of untruths, and likely, if they can be seen as untruths, do not appear to have been willingly or purposefully untrue, inconsistencies are fertile ground for impeachment on cross examination.   Where the Defendants find it fanciful that Maples fails to remember being at the hospital overnight, and remembers the incident taking place, not in the afternoon, but early in the morning, even when confronted with evidence to the contrary attached to this motion, the Defendants confronting Maples once again with those contradictions during Maples' cross examination might cause some jurors to agree with the Defendants.   Similarly, the Defendants contend as incredible that Maples provided detailed information during his deposition about the night before the arrest, remembering exactly what he was doing and even what time he went to bed; Maples now asserts that he may have been remembering another evening.   Bringing these details and Maples' explanation out at trial to impeach him is likely to have an effect on the case, similar to the effect of many sanctions that the Court might impose.   Thus, while these statements might controvert facts that the Defendants reasonably believed would be uncontroverted for trial, because cross examination provides an adequate forum for the Defendants to likely penalize Maples for the inconsistencies, Maples' statements have not substantially interfered with the judicial process.

**III.    MAPLES' CULPABILITY, IF ANY, IS NOT COMMENSURATE WITH THAT OF PARTIES WHO ABUSED DISCOVERY IN TENTH CIRCUIT PRECEDENT.**

The Defendants contend that Maples' culpability rises to the level making dismissal appropriate, because he had the opportunity to explain why his account differed from Vollmer's, and, instead of doing so, he continued to be untruthful about the night and day of the incident. Maples responds that he is not culpable, as he disputes the facts about which the Defendants assert that he is lying.   Maples appears to dispute many of the facts, contends that he lacks memory as to others, and stands by some of his other statements as truthful.   Regardless what the factfinder determines at trial, Tenth Circuit precedent counsels that Maples' culpability, if any, does not support dismissal of his case as a sanction.

Maples' conduct pales in comparison with that of the discovery abuses in Archibeque v. Atchison, Topeka and Santa Fe Ry. Co. and Garcia v. Berkshire Life Ins. Co. of Am.   Whereas the plaintiff was alleging damages from an injury to her back in Archibeque v. Atchison, Topeka and Santa Fe Ry. Co. and specifically disclaimed any history of back pain or injury; Maples does not deny, and did not deny at his deposition, that he ran from the police.   While he disputes the Defendants' assertion that he was breaking into 1111 Major, he sticks by his statement that he lived there, and the Defendants have not referred the Court to any evidence showing it undisputed that he did not.   Moreover, regarding his failure to disclose his medical visits to Presbyterian Hospital, although Maples forgot where one of his fourteen hospital visits during 2006-2010 took place, it is not as if Maples disclaimed having visited the hospital in the four years before the incident.   While Archibeque v. Atchison, Topeka and Santa Fe Ry. Co. might provide support for sanctioning Maples if he had said that he had not visited a medical doctor before the incident with the Defendants, or perhaps if he disputed whether he ran from officers -- to which he admitted

during his deposition -- it does not support sanctioning Maples for his inconsistent statements or lack of memory.   Maples' sin, if any, is that he failed to "suggest[] there were additional medical providers beyond the 2-3 that he did disclose."   Reply at 3.   In addition to disclosing these two or three providers, Maples gave the Defendants a medical release, allowing them complete access to his medical history.   With the medical release, the Defendants were able to discover his Presbyterian Hospital records in their routine discovery, which likely eliminated judicial interference that might arise from a dispute whether he should provide such a release or a subsequent, tardy disclosure of the forgotten Presbyterian Hospital records.

The egregious conduct of the plaintiff in Garcia v. Berkshire Life Ins. Co. of Am. is telling whether dismissal is appropriate here.   Whereas Maples signed his medical release at the Defendants request, the Tenth Circuit noted that the plaintiff in Garcia v. Berkshire Life Ins. Co. of Am. "failed to submit to an independent medical examination until 2007, and withheld the authorization Berkshire required in order to get access to her medical records."   559 F.3d at 1177. The contrast is also present in the extent of the plaintiff's affirmative misrepresentations in Garcia v. Berkshire Life Ins. Co. of Am., as the Tenth Circuit noted:

> Ample evidence supported the conclusion that Ms. Garcia was herself culpable for the fabrications submitted in this case.   Numerous inauthentic documents were submitted over a several year period, counseling against an explanation of mistake. Moreover, the fabrications were carefully constructed to look like authentic documents.   Letters were made to look as though they were printed on authentic letterhead; emails were carefully spliced together so as to appear accurate; fax banners were added to documents to disguise their origin. . . .   Finally, Ms. Garcia's evasive, inconsistent answers and inability to provide an explanation for the fabrications during the hearing cast further doubt on her accounting of events.

569 F.3d at 1181 (internal references omitted).   Here, Maples did not provide falsified documents or false statements that "were carefully constructed,' or even that appear, on their face, "accurate."

-41-

569 F.3d at 1181.  Rather, Maples appears to have forgotten important facts and, in some cases, perhaps instead of admitting that he forgot them, fabricated that he was at home when he was not, or how he got outside the house; a jury trial will sort that out and decide what is the truth of the matter.  Additionally, whereas the Tenth Circuit in Garcia v. Berkshire Life Ins. Co. Of Am. noted that the plaintiff was not able to provide explanation for her fabrications, Maples is able to explain what he did and why he did so, and has also conceded multiple of the Defendants' factual assertions.  Such fabrications, if that is what they are, do not rise to the level of carefully fabricating and producing four inauthentic documents, but rather appear to be close to mistake. The Court concludes that the circumstances surrounding Maples' statements provide little evidence of culpable conduct on his part, and counsel that dismissal of the case as sanction for his conduct is therefore improper.

IV.   **THE COURT FINDS THAT, BECAUSE IT HAS NOT PREVIOUSLY WARNED MAPLES OF DISMISSAL, AND BECAUSE MAPLES' STATEMENTS ARE DISTINGUISHABLE FROM THE ABUSES IN CASES IN WHICH THE TENTH CIRCUIT AFFIRED DISMISSAL WITHOUT NOTICE, DISMISSAL IS UNWARRANTED.**

The Defendants contend that Archibeque v. Atchison, Topeka and Santa Fe Ry. Co. and Chavez v. City of Albuquerque, counsel in favor of forgoing any warning of dismissal and instead dismissing the case immediately.  See Motion to Dismiss at 15.  Maples asserts that the Defendants' reliance on Chavez v. City of Albuquerque is misplaced, as the plaintiff in Chavez v. City of Albuquerque admitted to perjuring himself throughout discovery while on the stand in cross-examination, and the Honorable William P. Johnson, United States District Judge, dismissed the case after the trial had taken place.   The Tenth Circuit has given guidance to district courts that "dismissal represents an extreme sanction appropriate only in cases of willful misconduct."

Ehrenhaus v. Reynolds, 965 F.2d at 920.   The circumstances surrounding Maples' statements, when compared with Archibeque v. Atchison, Topeka and Santa Fe Ry. Co. and Chavez v. City of Albuquerque, show that willful misconduct is not present here.

In Chavez v. City of Albuquerque, the Tenth Circuit affirmed Judge Johnson's dismissal sanction where, throughout pretrial practice and multiple times in discovery, including in the plaintiff's depositions and sworn answers to interrogatories, he "steadfastly maintained that he was not the suspect police had been chasing."   402 F.3d at 1042.   The plaintiff, at trial, while undergoing cross-examination, finally admitted that he had lied in discovery and that the police arrested the correct subject, as he was the suspect who led the police on a chase throughout the city. See 402 F.3d at 1042.   Judge Johnson submitted the case to the jury, which returned a verdict for the plaintiff, and took the defendant's rule 50 motion under advisement, in which the defendant argued that Judge Johnson should dismiss the case as a sanction for the plaintiff's perjury throughout discovery.   See 402 F.3d at 1043.   Judge Johnson, after the trial, granted the rule 50 motion, dismissed the case, and set aside the jury's verdict, which the Tenth Circuit affirmed.   See 402 F.3d at 1043.

The case here has not yet proceeded to trial or been submitted to the jury.   Thus, whereas Judge Johnson in Chavez v. City of Albuquerque could not realistically have warned the plaintiff before dismissal, because Chavez changed his story or admitted being untruthful only during trial, as this case remains pre-trial, the Court has the opportunity to warn Maples here that further untruths may warrant dismissal as a sanction.   Additionally, Chavez has admitted to omitting his Presbyterian Hospital visits, has explained that he cannot recall his overnight stay at UNMH, and has explained why he was outside 1111 Major and his positive test for methamphetamine in 2010.

-43-

Whereas the plaintiff's continued adamant denial of facts throughout discovery in <u>Chavez v. City of Albuquerque</u> precluded the defendant from understanding at all the facts of the case, and precluded them from having any expectation that the plaintiff would testify inconsistently with his pretrial denials at trial, Maples here has provided the Defendants ample information from which they can anticipate his trial testimony.   Although Maples might not have admitted certain facts that they believed he would, where he continues to stand behind his statements, regardless of their inconsistencies, he has provided explanation why.   Thus, not only can the Defendants anticipate his trial testimony, but they can also anticipate testimony that is ripe for impeachment, a situation for which trial attorneys often prepare.   Whereas the Defendants assert that Maples "has already weaved his tangled web of lies throughout discovery and such a web cannot be untangled by removing a single strand," Motion to Dismiss at 15, through his Affidavit and his Response, he has removed some strands by explaining his inconsistencies, but he has also given the Defendants a blueprint of his web with which they can now untangle many strands while cross-examining Maples on the stand.

The importance of the subject matter underlying Maples' inconsistencies is also distinguishable from the precedent in which dismissal without notice was found proper. The plaintiffs' statements proved untrue in <u>Chavez v. City of Albuquerque</u> and in <u>Archibeque v. Atchison, Topeka and Santa Fe Ry. Co.</u> were statements misrepresenting facts on which the case turned.   This situation is not the case with Maples' inconsistencies.   In <u>Chavez v. City of Albuquerque</u>, if the plaintiff admitted he was the person who had led police on a chase throughout the city, the officer's use of force would likely have been seen as more reasonable than if, as he asserted pretrial, "he had simply been walking to a friend's house after an evening playing bingo

-44-

when he had encountered [the officer]." 402 F.3d at 1043.   Similarly, whereas the plaintiff in

Archibeque v. Atchison, Topeka and Santa Fe Ry. Co. was suing for on-the-job injuries to her

lower back, and denied throughout discovery that she had ever before had injuries, only to be faced

with the defendants' evidence that she had a history of lower back problems spanning over the

previous ten years, her untruthful statements went to the heart of the case.   The issue here is

whether Vollmer's and/or Fox's use of force in arresting Maples was excessive or was reasonable.

Here, Maples has admitted throughout discovery that he was the subject of the 911 call and that he

fled from Vollmer when Vollmer came to 1111 Major.   Although his statements about why he

was outside 1111 Major when police arrived may be inconsistent, he nevertheless admits that he

was outside when police arrived.   Further, while the Defendants correctly point out that damages

are at issue in this case, and that Maples failed to provide them with information regarding his

visits to Presbyterian Hospital, he does not deny going there, he provided the defendants with a

medical release, and provides a plausible explanation for not remembering those visits.   Maples'

statements and the circumstances surrounding any inconsistencies are thus distinguishable from

the adamant denials of crucial facts in Tenth Circuit cases in which dismissal without prior notice

was upheld.   Accordingly, the Court concludes that dismissal here, without having provided

Maples notice, is unwarranted.

**V.     THE CIRCUMSTANCES OF THE CASE, AND THAT THERE ARE LESSER SANCTIONS WHICH THE COURT BELIEVES WOULD BE ADEQUATE TO REDRESS MAPLES' CONDUCT, COUNSEL THE COURT NOT TO DISMISS THE CASE.**

The Defendants assert that "[l]ying under oath does not merit a lesser sanction [than

dismissal] as it demonstrates a blatant disregard and disrespect for the judicial process and renders

the oath given to deponents entirely meaningless."   Motion to Dismiss at 16.   The Court agrees,

generally, with the Defendants on that proposition, depending of course on the circumstances. The circumstances here, however, do not support their contention that Maples "has told multiple untruths under oath in this case" which have "undermined Defendants' ability to impeach him, prepare for trial or, perhaps . . . file a motion for summary judgment on the basis of qualified immunity."   Motion to Dismiss at 16.   Rather, the limited record before the Court seems to show that the circumstances surrounding Maples' statements are unique.   Maples had visited hospitals an extraordinary number of times in the years before the incident, explaining why he might forget where a few of these number visits took place.   Maples' relationship with K. Lane, the person with whom he asserts he lived at 1111 Major at the time of the incident, appears to have been tumultuous, as demonstrated by his adherence to the otherwise hard-to-believe explanation that he tested positive for methamphetamine because K. Lane held him down and force-fed it to him.   It also provides a plausible explanation for S. Lane's call to police, telling them that Maples did not reside at 1111 Maples.   As for Maples' contention that he was able to provide details about the night before the incident, such as his smoking marijuana and heading to bed, when UNMH records reflect that he was in the hospital, while his explanation that he must have confused that evening with his normal routine stretches credulity, it is plausible, and, because it is plausible, the Court believes the credibility of the story should be left the determination of the factfinder and not to the Court.   These circumstances and explanations demonstrate that Maples may have misremembered certain events, including details surrounding the incident.   In the context of Tenth Circuit case law discussing dismissal sanctions, however, this tension in the two sides' accounts does not yet, pre-trial, demonstrate willfulness sufficient to support sanctioning Maples by dismissing his lawsuit.

Rule 37(c) provides that, in situations such as this, where "a party fails to provide information" to the other side in discovery, the Court has discretion to impose a litany of sanctions, from ordering payment of fees that the failure incurred, informing the jury of the party's failure, ordering that a certain fact is established as uncontroverted, or dismissing the action in whole or in part.  Fed. R. Civ. P. 37.  Although the Defendants assert that "[t]his Court is not tasked with imposing a lesser sanction, but rather imposing the appropriate sanction under the circumstances: dismissal," the Court nevertheless, in exercising its discretion under the rule, considered sanctioning Maples pursuant to rule 37 with a sanction less extreme than that of dismissal. Although it may be fair to sanction Maples by deeming certain facts as established, such as that he was at UNMH the morning of the incident, or that he visited Presbyterian Hospital, the Court does not believe that these issues will be hotly contested at trial, considering the documentary evidence that the Defendants submitted to the Court with their Motion to Dismiss.   Similarly, the Court also considered as an appropriate sanction "inform[ing] the jury of the party's failure" to list Presbyterian Hospital as his medical provider, to admit that he was at the hospital that morning, or to answer the Defendants' question what happened during the arrest by informing the jury that the officers struck him only.  Fed. R. Civ. P. 37(c)(1)(B).  The Court believes that either of these lesser sanctions would be effective; they would provide the Defendants with the facts that they appear to want to establish, penalize Maples for his imprecision in discovery, and are justified under the circumstances.   The Court concludes, however, that the better course of action is to not sanction Maples.   The Court, in its years in practice trying cases before it took the bench, learned that some evidence is more persuasive to the jury and more effective coming from the trial attorneys, rather than from the person in the robe behind the bench.   The Court believes it is more

just, and will ultimately provide a benefit to the Defendants, for the Court to withhold sanctioning Maples, and to let the Defendants inform the jury of Maples' failures to accurately answer their interrogatories and questions at his deposition at trial during Maples' testimony.   Thus, while dismissal is inappropriate, and while there are adequate sanctions alternative to dismissing Maples' case, the Court will not impose any sanctions.

A case often has impeachment material.   If the Court were to dismiss a case every time the plaintiff could be impeached, there would not be many cases that go to trial.   The trial, rather than draconian dismissal sanctions by the judge, is the better way to sort out inconsistent versions of the facts.   Finally, every experienced litigator has had a client who takes seriously the routine instruction in deposition preparation to precisely answer only the questions asked, and the litigator has thus not gotten all of the facts out until he or she conducts a little cross-examination at the end of the opponent's deposition.   That situation appears to be the case here.   Again, the Court is reluctant to dismiss a case because the facts did not come out at the deposition without cross.

In conclusion, the circumstances surrounding Maples imprecise answers throughout discovery do not, under the Tenth Circuit's Ehrenhaus v. Reynolds factors, warrant dismissing the case as a sanction.   Although imprecise answers or inadvertent misrepresentations necessarily prejudice opposing parties, the prejudice of Maples' statements here is not substantial and does not weigh in favor of dismissal.   The factor regarding interference with judicial process also weighs against dismissing the case, as Maples' statements have not caused a delay in the proceedings and, aside from this Motion to Dismiss, have not caused an undue burden to the parties or to the Court. Based on the record before the Court, and on the parties' briefing and exhibits for the Motion to Dismiss, Maples is substantially less culpable than similar parties under Tenth Circuit precedent

who have been sanctioned with dismissal.   That the case is still pre-trial, and that the Court has not

warned Maples of dismissal before this memorandum opinion and order also weigh against

dismissing his case.   Finally, although the Court declines to do so here, there are adequate

sanctions aside from dismissal that the Court can justly impose on Maples for his conduct.   The

Court therefore finds the dismissal sanction unjust under the circumstances here, and will deny the

Defendants' Motion to Dismiss.

   **IT IS ORDERED** that Defendants' Motion to Dismiss, filed December 20, 2012 (Doc.

19), is denied.

              _____
              UNITED STATES DISTRICT JUDGE

*Counsel:*

Anna C. Martinez
Albert L. Hutchinson, Jr.
Aequitas Law, LLC
Albuquerque, New Mexico

   *Attorneys for the Plaintiffs*

David Tourek
 City Attorney
Stephanie M. Griffin
Kristin J. Dalton
  Assistant City Attorneys
City of Albuquerque
Albuquerque, New Mexico

   *Attorneys for the Defendants*

-49-